**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-MJ-198 (ZMF)** |
| **NATHANIEL LAMAR NELSON SCOTT,** | |
| **Defendant.** | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF**
**PRETRIAL DETENTION OF DEFENDANT NATHANIEL LAMAR NELSON SCOTT**

The United States of America, by and through its undersigned counsel, respectfully submits this memorandum in support of its motion that Defendant Nathaniel Lamar Nelson Scott be detained pending trial pursuant to Title 18, United States Code, Section 3142(f)(1)(A) (crime of violence). On June 5, 2024, the defendant traveled from Maryland to the District of Columbia intending to sexually abuse a six-year-old girl. The defendant was arrested and has been charged by criminal complaint with violating Title 18, United States Code, Section 2423(b) (travel with intent to engage in illicit sexual conduct). The government respectfully requests that this Court consider the following points and authorities, as well as any information presented at the detention hearing, and order the defendant detained pending trial.

**Factual Background**

A Task Force Officer with the Federal Bureau of Investigation (FBI)–Metropolitan Police Department (MPD) Child Exploitation and Human Trafficking Task Force (CEHTTF) is active in an undercover capacity on a fetish website. While many users of the site are pursuing lawful, adult sexual activity, law enforcement knows that individuals also use the site to pursue illicit sexual activity, including with children.

In May 2024, the undercover agent made several posts in a group on the fetish website. The group is dedicated to communicating with other users of a certain end-to-end encrypted messaging application.[1]  In the posts, the undercover agent referred to himself as a "kinky daddy" and indicated he was looking for "very open-minded people" to explore similar interests on the encrypted messaging application.

An individual later identified as the defendant, Nathaniel Lamar Nelson Scott, sent the undercover agent a direct message on the fetish website, asking "So what are you looking to do with a perverse Daddy ?"  The undercover agent responded, "Looking to me[et] like minded and see where it goes . I am a very open taboo[2] dad here . Let me know if you wanna chat on [the encrypted messaging application]."  The undercover agent then provided his username, and on May 25, 2024, the undercover agent and the defendant began messaging on the application.

A selection of the initial conversation follows:

**UC:** I'm a taboo perv into taboo no limits[3]

**UC:** I watch what I say on [the website], lots of squares

**UC:** U a naughty dad too with young

**UC:** B or g?

---

[1]  When a chat is end-to-end encrypted, only the participants to that chat can see its contents. Because the application is unable to access the contents of the chat, it is not possible for the application to detect the discussion of child sex abuse or the transmission of child sex abuse material.  For this reason, individuals interested in the sexual abuse of children frequently prefer to communicate via applications offering end to end encryption.

[2]  "Taboo" is a term commonly used by individuals with illicit sexual proclivities, including incest, the sexual abuse and exploitation of children, and child pornography.

[3]  Individuals interested in the sexual abuse and exploitation of children often refer to themselves and their proclivities using the term "perv," which can be either a noun or a verb.  "No lims" is short for "no limits," which means just that—no limits.  Like taboo, no limits and perv are also term commonly used by individuals with illicit sexual proclivities.

**SCOTT:** [replying to "I watch what I say on [the website], lots of squares"] Same here, I've learned my lesson, from [the website] and other places never can be too cautious Lol

**SCOTT:** I hate the hypocrisy tho! So many folk pretending

**SCOTT:** [replying to "U a naughty dad too with young"] Not a father no, not so lucky, just a Daddy Dom!  Haha.  I'm extremely taboo, also pretty much no limits, and I'm a Man.

**SCOTT:** If that changes things, I understand.  Most of the naughty parents I've connected with on here only like talking to other parents.  I get it

**UC:** Yeah, I like to mostly talk to other parents and see where it goes , have shared live and that sort of thing.  What do u perv too

**SCOTT:** Yeah I get it I'm not mad about it, just unfortunate for me haha

**UC:** lol

**SCOTT:** I perv to boy and girls and lots of taboo stuff on twitter mostly

**SCOTT:** I have groomed a few

**UC:** Nice

**SCOTT:** And I like em young

**UC:** Mine is 6 [**SCOTT** reacted with a heart symbol]

**SCOTT:** That's the perfect age

**UC:** Yes

**SCOTT:** 6 is one of my fav numbers

**SCOTT:** I seen Half that

**SCOTT:** I had a few young sluts I groomed

**SCOTT:** But never been lucky enough to play irl[4]

---

[4] The initialism "irl" stands for "in real life."

**SCOTT:** Just hoping one day I can find a pxdo[5] mommy or pxdo daddy that will let me play with them or have my own 1 day

**SCOTT:** I'm so horny rn[6] dude lol most thinking about your little girl

**UC:** I'm out of town this weekend actually driiving

**SCOTT:** Are you into both sex or just girls?  Do you like it's too?

**UC:** Let's connect next week

**UC:** I'm in dc u?

**SCOTT:** I'm into boys a little now too, but mid teens age range for them

**SCOTT:** [replying to "I'm in dc u?"] I'M in MD not to far from Dc tho

**UC:** Ok

As the conversation continued, the defendant asked the undercover agent questions about his divorce and whether the mother of the undercover agent's purported six-year-old daughter knew that he was sexually abusing her.

The conversation continued throughout late May and early June 2024.  During the conversation, the undercover agent told the defendant, "sniffed daughters panties this morning and shot a load."[7]  The defendant reacted with a heart and replied, "Mmm bet those panties small so pure and makes your dick hard becuz its so naughty."  The undercover agent responded, "Yes so tiny !" and sent a picture of a penis next to girl's underwear and a pink blanket.  The defendant later responded, "I want to smell those panties when they are fresh."

---

[5] The term "pxdo" appears to be an intentional misspelling of "pedo," which is short for "pedophile."  Individuals with illicit sexual interests will often intentionally misspell certain words to avoid detection.

[6] The initialism "rn" stands for "right now."

[7] The phrase "shot a load" is slang for ejaculation.

The defendant continued to ask the undercover agent questions about his abuse of his purported six-year-old daughter.  A portion of the conversation follows:

**SCOTT:** What's it like doing naughty thing with her

**SCOTT:** Is she welcoming and excited to be naughty or does she resist and protest verbally ?

**UC:** No , I don't do anything crazy to make her uncomfortable, she will jerk me off and suck it mostly and I'll will lick her and rub

**UC:** Jerk off near her while touching [**SCOTT** reacted with a heart symbol]

**UC:** What kind of porn u perv too

**SCOTT:** Lots of age play and incest stuff, loli[8] stuff and I'm also into BNWO/ interracial, misogyny /female objectification, interracial , corruption of innocence, messy/piss, Pet Play

**SCOTT:** [replying to "No, I don't do anything crazy . . ."] Does she get excited about play time

**UC:** Yes , at times she does.  She seems to be getting more into it

Following this conversation, the defendant asked if the undercover agent had ever let "someone else play" with his purported six-year-old daughter.  The undercover agent described a planned encounter that did not occur and remarked that it "[w]ould have been hot to see her with a strange cock."  The defendant responded, "Hmmm yeah that really close and really hot. I'd want to just watch at first," and then said, "Or just like be naked around and playing with myself or watch some porn together and see how it goes."

The defendant stated that "[b]athing would be suuuper hot," and asked if the undercover agent's purported daughter was still a virgin, as well as questions about her body type and vagina. The defendant later stated, "It's all a fantasy at this point, but it would be hot for a mommy or

---

[8] The term "loli" is short for "Lolita" and is commonly used by individuals interested in prepubescent to early teenage girls, to include child pornography and child erotica.

daddy like you to kind of groom me in a sense to be more and more depraved.  I'm cautious about

it still, but taking to you is very seducing and exciting."

On the morning of June 5, 2024, the undercover agent told the defendant that his purported

daughter would be with him that evening.  During the conversation, the defendant stated:

> . . . I was hoping you were more bi and open to paying with me a bit, which might help me feel more comfortable but I do[n't] even know if you're my type….not gonna lie, there is a part of me that is nervous cuz like you said I never done it before but last week I groped an 8[9] and man I was so hard and filled with so much lust, I want to do it so bad and the way you do it is the perfect way , gentle and fun, I really admire you for that and happy for her.  All little girls need pedo cock to help groom them and make them into good little sluts.

The undercover agent responded that he was not looking for one-on-one sexual contact with other

men.  Below is an excerpt of the conversation that followed:

> **UC:** But again, It sounds like your either skeptical or u sure of what u would want to do, so I don't know.  I went through it with the last guy.  His suggestion was to meet at a public place close to my apartment and have me FaceTime her with him next to me with her pulling her shirt up or taking her patns off

> **SCOTT:** When up say unsure, like you mean what I want to do in person or what?

> **UC:** Yes

> **SCOTT:** Like you, I don't want to get caught ofc[10] so yeah I'm cautious and nervous about that but I was also just trying to be respectful and not "pushy" but maybe I'm fucking up lol

> **UC:** lol I understand

---

[9] The defendant claimed that he molested an eight-year-old girl during a game of hide-and-seek. The defendant stated that when he found her, he "just took a risk and tickled her" and "touched her all over."  The defendant said, "Low key I think she is aware of what I did and liked it have not been able to see her for a while but hope to soon" and "Next time I'll try more."  During his custodial interview, the defendant claimed that this was a fantasy he made up to ingratiate himself with the undercover agent.

[10] The term "ofc" is internet slang for "of course."

**SCOTT:** Yes if we are in person I'd want to introduce and maybe tickle her and grip her and molest her and kiss her then watch you too a bit then get comfy and lick her and rub my tip with you there to encourage me to embrace it and hope she has fun

**UC:** Mmmm that would make me so hard

**SCOTT:** Yeah, so that's what I want

**SCOTT:** There, no more hesitation or indecisiveness

The undercover agent asked the defendant to "validate" himself by taking a picture in which he was holding four fingers up. The defendant sent a picture of four fingers over an adult male penis. The individual in the picture is a Black male. The undercover agent sent the defendant a picture of his purported daughter with her shirt raised.[11]  The undercover agent stated, "If you want to do this , they best way is to meet by my place in public, then I can FaceTime her and her her show her pussy, then we head walk up to my apt."  The defendant responded, "I want to lick every inch."

The undercover agent then discussed plans to meet up in the District of Columbia later in that evening. The defendant stated, "I was just thinking, like what about taking a bath?  I think that is so hot."  The undercover agent responded, "Yes I agree maybe a good way to start too, and the defendant responded, "can't wait."  The defendant later indicated that he would not be taking a shower after work due to the plan to take a bath.

The undercover agent and the defendant agreed to meet at a bar in Northwest Washington, D.C.  Shortly before the meeting, the undercover agent sent the defendant a picture of the shirt he was wearing. On June 5, 2024, at approximately 6:59 p.m., the defendant entered the bar and went straight to the bathroom.  Upon exiting the bathroom, the defendant approached the undercover agent and shook his hand.  The defendant ordered beers for himself and the undercover agent and

---

[11] The picture did not depict an actual child.

sat next to the undercover agent at the bar.  The defendant stated that he was from the Crofton, Maryland, area, and discussed sports with the undercover agent.  After several minutes, the undercover agent told the defendant that he was not trying to rush him but that they needed to get back to the apartment because the undercover agent's purported daughter was alone.  The defendant acknowledged this, got up, and walked down the bar to get the bartender's attention and pay the tab.  The undercover agent informed the defendant that the bar was too crowded to FaceTime his daughter and that he would show her on FaceTime once they entered his apartment building, which he said was in the same block.  The defendant agreed and followed the undercover agent outside the bar, at which time CEHTTF members arrested him.  The defendant told arresting agents that he was just trying to leave.

The defendant waived his *Miranda* rights and participated in a custodial interview with CEHTTF members.  The defendant admitted to driving into the District of Columbia from Maryland to meet a man he did not know but had been chatting with online.  (The defendant was not aware in the interview that the man was an undercover agent.)  The defendant offered several self-serving explanations, some of which are contradictory.  He denied that he intended to abuse the child and explained that he was into role playing.  The defendant could not bring himself to say the age of the child but said that she was younger than a teenager and that she was probably too young to be left home alone.  He claimed that he did not know for certain whether the man with whom he had been speaking had a child.  He also claimed that he had changed his mind and that when he got outside of the bar, he had intended to tell the man it was not going to work out and then leave.

During processing, the defendant identified himself.  CEHTTF members also recovered the defendant's Maryland driver's license.

**<u>Identification of the Defendant</u>**

Before his June 5, 2024, arrest, members of the CEHTTF had already identified the suspect who was communicating with the undercover agent as the defendant, Nathaniel Lamar Nelson Scott.  A member of the CEHTTF served an administrative subpoena on the fetish website for the username that contacted the undercover agent.   The website's response included, among other information, two Google Gmail addresses, a verified telephone number with a 443 area code, and a date of birth later determined to be the defendant's.  A member of the CEHTTF then served an administrative subpoena on Google.  Google's response indicated that the recovery phone number associated with one of the accounts was the same phone number provided by the fetish website. A member of the CEHTTF also served an administrative subpoena for the phone number on T-Mobile.  T-Mobile responded that the number is subscribed to a woman with the initials S.H. (Before his custodial interview, the defendant revealed that S.H. is his mother.)  The service and billing address on the T-Mobile account is the same address that is listed on the defendant's Maryland driver's license.  (Before his custodial interview, the defendant provided this address.) In addition, a search of the phone number in commercial databases revealed that it is associated with Nathaniel Lamar Nelson Scott, a Maryland resident whose date of birth is the same date of birth provided by the fetish website.

**<u>The Defendant's Access to Child Pornography</u>**

During the chat, the undercover agent asked the defendant if he had seen child pornography.  The defendant responded, "No, I'm kinda new to this, and I'M VERY VERY VERY cautious and most ppl don't share if you don't have anything to trade so yeah."  Later in the chat, however, the defendant indicated that he had previously viewed child pornography:

Like I said, I don't really have anything lol I'm too scared to keep it on my phone,
I had a few vids in old chats but I don't know how to send it without saving it, and
I think I might have deleted those chats after getting paranoid

During his custodial interview, the defendant denied having child pornography on the two cellphones that were seized from him incident to his arrest but said he might have images of people posing as prepubescent children. The defendant could not offer a coherent explanation for why he was carrying two phones. The government has not yet examined the devices.

## Procedural History

On Wednesday, June 5, 2024, the defendant was arrested upon probable cause in the District of Columbia after driving into the District of Columbia from Maryland and meeting the undercover agent in a bar. That same evening, in accordance with Federal Rule of Criminal Procedure 5(b), the government applied for a criminal complaint and arrest warrant, which this Court issued the next morning. The defendant then made his initial appearance before this Court. On the government's motion, the defendant was held pending a detention hearing, which is scheduled for Monday, June 10, 2024. The government now respectfully submits this memorandum in support of its motion for pretrial detention.

## Applicable Legal Standard

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community," the Court shall order the defendant held pending trial. 18 U.S.C. § 3142(e). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). As a threshold matter, the government must demonstrate by a preponderance of the evidence that a defendant is a flight risk, *see United States v. Anderson*, 177 F. Supp. 3d 458, 466

(D.D.C. 2016) (citing *United States v. Xulam*, 84 F.3d 441, 443 (D.C. Cir. 1996)), and by clear and convincing evidence that he is a danger to the community, *see* 18 U.S.C. § 3142(f).

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

Here, Congress has specified that for an offense involving a minor victim under Section 2423, "[s]ubject to rebuttal by the [defendant], it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(E). This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released"). But even if the defense produces credible evidence, the presumption retains evidentiary weight and is considered by the Court among the Section 3142(g) factors. *See, e.g.*, *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) ("Even when a defendant satisfies his burden of production, however, 'the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court.' . . . The presumption remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." (quoting

*United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001))); *United States v. Ali*, 793 F. Supp. 2d 386, 388 n. 2 (D.D.C. 2011) ("[C]ircuits that have considered the issue require using the presumption as a factor even after the defendant has produced credible evidence.").

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device. *See Smith*, 79 F.3d at 1210; *Williams*, 798 F. Supp. at 36.

<u>Argument</u>

For reasons that follow, the defendant poses an unmitigable risk to community safety. Because there are no conditions of release adequate to reasonably assure community safety, this Court should order the defendant detained pending trial.

**A. Nature and Circumstances of the Charged Offense**

The nature and circumstances of the charged offense weigh heavily in favor of detention. Contrary to the defendant's post hoc, self-serving claims, he was not merely roleplaying. "This defendant did not simply express an interest in a sexual encounter with a minor, and he did not simply make arrangements for a sexual encounter with a minor, but he took the affirmative, unequivocal step of driving his vehicle into the District of Columbia to arrive at the appointed time and place." *United States v. Breeden*, No. 15-MJ-0506 (AK-ABJ), 2015 WL 13310427, at *7

(D.D.C. Nov. 16, 2015).   Indeed, the charged offense both **(i)** is the basis for the statutory presumption of dangerousness and **(ii)** involves a minor victim, which are two factors this Court is required to consider in assessing the nature and circumstances of the offense.  *See* 18 U.S.C. § 3142(G)(1) ("The judicial officer shall . . . take into account the available information concerning— the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a minor victim . . . .").  *See Breeden*, 2015 WL 13310427, at *7 ("Congress specifically directed courts to consider whether a defendant is charged with a 'crime of violence' when assessing the nature and circumstances of the offense factor, and it designated a violation of section 2423(b) to be a crime of violence."); *accord United States v. Johnston*, No. 17-MJ-0046 (BAH), 2017 WL 4326390, at *4 (D.D.C. Sept. 28, 2017) (noting that a violation of Section 2423(b) "is a serious crime" subject to a rebuttable presumption of detention); *United States v. Beauchamp-Perez*, 822 F. Supp. 2d 7, 10 (D.D.C. 2011) ("With respect to the nature and circumstances of the offense, the charged offense is serious and involved traveling with intent to have sex with a twelve year-old minor victim.  The Court finds that this factor supports detaining the defendant; indeed, it is the basis for the presumption in favor of detention.").

The seriousness of the offense is also reflected by Congress's judgment that those convicted of the charged offense face up to 30 years' imprisonment upon conviction.  *See* 18 U.S.C. § 2423(b); *Johnston*, 2017 WL 4326390, at *4 (considering, as factors weighing in favor of detention, that a conviction "allows for imprisonment up to 30 years" and that "the defendant may face substantial prison time").  Indeed, the United States Sentencing Guidelines also reflect the serious nature of the offense with which the defendant has been charged.  Based on the conduct known to the government at this early stage of the case, the government estimates the defendant's total Offense Level under the Guidelines to be 36, yielding an estimated Guidelines range of 188

to 235 months' imprisonment (i.e., approximately 15.66 to 19.58 years' imprisonment), which further reflects the very serious nature of the offense conduct.   *See* USSG §2G1.3(a)(3) (base offense level of 28); USSG §2G1.3(b)(5) (eight-level enhancement for minor victim under 12).

Accordingly, the nature and circumstances of the charged offense weigh heavily in favor of detention.

### B.  The Weight of the Evidence Against the Defendant

The second factor to be considered, the weight of the evidence, also weighs heavily in favor of detention.  The evidence against the defendant in this case is extremely strong.  As detailed above, the defendant met an undercover agent through a fetish website, and the FBI was able to identify him based on information he provided when he registered his account with that site.  The defendant engaged in extensive conversations with the undercover agent over an encrypted messaging application about his sexual interest in children and, specifically, his interest in sexually abusing the agent's purported six-year-old daughter.  Shortly before traveling into Washington, D.C., to meet the undercover agent, the defendant stated he wanted to "tickle her and grip her and molest her and kiss her then watch you too a bit then get comfy and lick her and rub my tip."  He then said, "Yeah, so that's what I want" and "There, no more hesitation or indecisiveness."  He also discussed wanting to start things off by bathing with the child and said that, because of the plan to bathe, he would not shower after work.

In addition, the defendant then admitted to meeting the undercover agent online, talking to him on an messaging application, and driving from Maryland to meet him at a bar in the District of Columbia.  His later, self-serving assertion that this was all "roleplay" is belied by the substance of his messages with the undercover agent and the fact that he traveled from Maryland into Washington, D.C., to meet with the undercover agent at the appointed time and place.  When the

14

undercover agent told the defendant that it was time to go to the child, the defendant got up and paid for both of their beers and then walked out with the undercover agent. "But for the fact that defendant was communicating with an undercover officer, defendant could have come face-to-face with a minor and a willing parent." *Breeden*, 2015 WL 13310427, at *8.

While some judges in this Court have indicated that this factor should be given less weight, in *United States Blackson*, following a thorough review of the text of Section 3142 and decisions analyzing this factor, then–Chief Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." No. 23-CR-25 (BAH), 2023 WL 1778194, at *8 (D.D.C. Feb. 6, 2023) (Howell, J.). Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* at *10. In an unpublished opinion, the D.C. Circuit affirmed then–Chief Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). The Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149–150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang*; this factor should be given no less weight than any other factor.

Indeed, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 WL 1778194, at *10. This is such a case, and the weight of the evidence favors detention.

### C.  The History and Characteristics of the Defendant

The defendant has admitted to having a sexual interest in children, claimed to have recently

15

molested an eight-year-old girl, and traveled into the District of Columbia with the intent of sexually abusing a six-year-old girl. He also indicated that he has previously viewed child pornography using messaging applications. While the defendant will likely be able to point to some positive characteristics that might favor release, such as his employment and family support, those positive factors did nothing to prevent him from taking affirmative steps to sexually abuse a six-year-old girl.

Although the defendant appears to have minimal criminal history, the absence of prior criminal history is not sufficient to rebut the statutory presumption of dangerousness on the facts of this case. *See, e.g. Breeden*, 2015 WL 13310427, at *7 ("But the inferences the defendant is asking the Court to draw do not go far enough. The Court is not certain that a lack of *more* incriminating evidence constitutes 'evidence' that rebuts the presumption arising from the undisputed facts of the case." (emphasis in original)); *Pope v. United States*, 739 A.2d 819, 826 (D.C. 1999) (explaining that, under the D.C. Code's rebuttable presumption, if a court makes the requisite finding that a defendant committed certain crimes, then the "defendant is presumed to be dangerous (and subject to preventive detention) even if his prior record is clean and if no other showing of dangerousness is made").

Accordingly, this factor also weighs in favor of detention.

### D.  The Nature and Seriousness of the Danger to any Person or the Community

The evidence in this case establishes that the defendant poses a grave danger to the community. As discussed above, the defendant claims to have recently molested an eight-year-old girl and is charged with traveling across state lines into the District of Columbia to sexually abuse a six-year-old girl. In addition, "the fact that the defendant poses a danger is presumed and is to be factored into the statutory analysis, even if some contrary evidence has been adduced."

16

*Breeden*, 2015 WL 13310427, at *9 (citing *Stone*, 608 F.3d at 945–46).

The government has sought information on the defendant's release plan but has not yet received a response. Based on available information, the government does not believe that the defendant will be able to rebut the statutory presumption of dangerousness or propose a release plan that will adequately assure the safety of the community.

### Conclusion

For the foregoing reasons, the government respectfully requests that this Court detain Defendant Nathaniel Lamar Nelson Scott pending trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

Dated: June 9, 2024          By:     /s/ *Paul V. Courtney*
Paul V. Courtney
D.C. Bar No. 1034252 / N.Y. Bar No. 5392337
Assistant United States Attorney
United States Attorney's Office for the
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-1719
Paul.Courtney@usdoj.gov